306 Ga. 726
FINAL COPY

S19A0951.  VARNER v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Tamaron Varner was convicted of malice murder and possession of a firearm by a convicted felon in connection with the shooting death of Joshua Deberry. On appeal, he contends that the trial court erred by denying his motion to exclude a police body-camera recording that depicted Deberry just after the shooting and that recorded the statements made by Deberry and his fiancée to the police. Appellant also contends that his trial counsel provided ineffective assistance by failing (a) to challenge the admission of certain statements in the recording; (b) to specially demur to the firearm-related charges in his indictment; (c) to object to the prosecutor's argument that he was presenting mutually exclusive defenses; and (d) to challenge the admission of evidence of a shotgun that had no connection to the charged crimes. Having reviewed the

record and the briefs, we see no error, so we affirm.[1]

1. Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed the following. Deberry worked as a handyman in Savannah, where he lived with his fiancée Audria Smith and her sons. He occasionally hired Appellant, who lived a few blocks away, to assist on local projects. In mid-December 2016, Deberry hired Appellant to help build part of a shed for a client. Although Deberry typically paid Appellant as Appellant worked, he could not pay Appellant for the shed work until the client paid in full when the shed was completed. A few days after the shed was supposed to have been completed, Appellant started calling and

---

[1] The crimes occurred on December 21, 2016. On February 22, 2017, a Chatham County grand jury indicted Appellant for malice murder, felony murder based on possession of a firearm by a convicted felon, aggravated assault, and possession of a firearm by a convicted felon. Appellant was tried from November 6 to 8, 2017, and the jury found him guilty on all counts. The trial court sentenced him to serve life in prison without the possibility of parole for malice murder plus five years for the firearm offense; the aggravated assault count merged into the murder conviction, and the felony murder count was vacated as a matter of law. Appellant filed a timely motion for new trial, which he later amended with new counsel. After a hearing, the trial court denied the motion on January 15, 2019. Appellant filed a timely notice of appeal, and his case was docketed in this Court to the April 2019 term and submitted for decision on the briefs.

texting Smith's cell phone, which she shared with Deberry, asking to be paid. Deberry and Smith responded to some of the messages, explaining that the shed was not yet complete due to weather delays, but Appellant's messages persisted and became increasingly threatening.

Around 9:30 a.m. on December 21, Deberry and Smith left their house to go to the grocery store. As they got into their car, Appellant ran up to them asking for his payment. Deberry again said the shed was not yet completed and quickly drove away, leaving Appellant standing in front of the house. Smith told Deberry to turn around and go back because she did not want to leave her 15-year-old son alone at home while Appellant was still outside. Deberry circled the block, and the couple went back inside the house to get the son. When they all came out, Smith and her son got into the car, and Deberry, who was not armed, stopped in the street in front of the car to argue with Appellant. As the men argued, Smith saw Appellant pull a gun from his jacket pocket and shoot Deberry three times before fleeing in the direction of his own house.

3

After hearing the gunshots, neighbors called 911. One of the first police officers to respond wore a body camera, which began recording audio and video on the way to the scene. Officers found Smith and a neighbor crouched on the pavement next to Deberry, who was bleeding profusely from his face and abdomen but was still alive. Smith told the officers that she knew where Appellant lived and described his house, the clothes he was wearing, and the argument with Deberry about being paid. Both Smith and Deberry told the officers that Appellant had used a .38-caliber revolver. After Deberry was taken to the hospital, Smith and her son were interviewed at the police station, and Smith then rode with an officer to point out Appellant's house. Deberry died a few hours later.

Appellant was arrested at his house that afternoon, and police officers found an empty .38-caliber revolver in a leather holster hidden under his mattress next to five unused .38-caliber rounds. Officers also found a shotgun hidden under a chaise lounge. During a recorded interview, Appellant admitted that he went to Deberry's house and argued with Deberry about not being paid, but claimed

4

that he was walking away when he heard the gunshots, which scared him, so he ran home.

At trial, a medical examiner testified that Deberry had been shot three times — once through his right arm, once in his right cheek, and once in his lower chest — and died of internal bleeding from the wounds to his cheek and chest. A firearms expert testified that two bullets recovered from Deberry's body matched the .38-caliber revolver found under Appellant's mattress. The State played the recording of Appellant's interview, but when Appellant testified, he told a very different story. He claimed that the gun belonged to Deberry and that Deberry pulled the gun on him during the argument, prompting Appellant to fight over the gun and causing it to fire accidentally. Appellant said that after the gun went off, he panicked, picked up the gun and the holster, and ran to his house, where he emptied the gun and flushed the three spent shell casings and two unspent bullets down the toilet before hiding the gun under his mattress. Appellant also claimed that the shotgun belonged to his uncle and that he did not own any guns because he knew that he

was not allowed to possess any guns as a convicted felon. Appellant had no explanation for the five unused rounds found next to the revolver.

Appellant does not dispute the legal sufficiency of the evidence supporting his convictions. Nevertheless, as is this Court's practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to reject Appellant's claims of self-defense and accident and to find him guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Bennett v. State*, 304 Ga. 795, 797 (822 SE2d 254) (2018) (holding that the jury was free "to reject [the defendant's] contrived and changing stories" supporting his claims of self-defense and accident); *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2. At trial, Appellant filed a motion in limine to exclude the video and audio recording made by the body camera worn by one of the first police officers who responded to the 911 call after the shooting. Appellant's only argument was that the video portion of the recording was substantially more prejudicial than probative. He made no argument about the audio portion, which included statements from Smith in which she described Appellant, the clothes he was wearing, where he lived, and the payment dispute, as well as mumbled statements from Deberry regarding the type of gun that Appellant used, which Smith repeated louder and clearer so the officers could understand what he had said.[2] The trial court denied Appellant's motion, and the recording was played three times for the jury: once during the State's opening argument, once during the testimony of the officer who wore the camera, and once during

---

[2] One of the officers asked if Smith or Deberry knew what kind of gun was used. Deberry's response was mumbled, due to his injuries, so Smith told the officer, "He just said '.38.'" The officer then asked if it was a revolver, and Deberry mumbled another response, so Smith said "Yeah, he just said 'yeah.'"

7

the State's final closing argument.[3]

(a) In this Court, Appellant reiterates the argument he made at trial that the recording should have been excluded under OCGA § 24-4-403 as substantially more prejudicial than probative, because it shows Deberry's blood pooling on the ground and flowing from his head and face as he waited for an ambulance. Although the segments of video that show Deberry are certainly disturbing to see — as are many images of fatal shootings — they and the recording as a whole were relevant and probative to show the crime scene, Deberry's injuries, and his and Smith's condition and demeanor as they spoke to each other and to the responding officers, as well as to corroborate Smith's and the officer's testimony. See *Plez v. State*, 300 Ga. 505, 508 (796 SE2d 704) (2017) (explaining that "photographic evidence that fairly and accurately depicts a body or crime scene and is offered for a relevant purpose is not generally inadmissible under [OCGA § 24-4-403] merely because it is gruesome"). See also *Davis*

_____

[3] It is unclear from the record, however, how much of the 18-minute recording was played each time. The segments Appellant challenges come in the first six minutes of the recording.

8

*v. State*, 306 Ga. 140, 145 (829 SE2d 321) (2019) (holding that "gruesome" video and photographic evidence depicting the crime scene and the victim's body were "relevant to the victim's identity and manner of death, as well as to corroborate [witnesses'] testimony"). Accordingly, the trial court did not abuse its discretion by admitting the video portion of the recording. See *Moss v. State*, 298 Ga. 613, 618 (783 SE2d 652) (2016) ("[T]he trial court had considerable discretion in determining whether the potential for prejudice substantially outweighed any probative value [of pre-incision autopsy photos].").

(b) Appellant also argues here that the trial court should have excluded the audio portion of the body-camera recording because it contained statements that were inadmissible under both the Confrontation Clause of the Sixth Amendment to the United States Constitution and the rule against hearsay. Because Appellant did not object to the admission of the recording on these grounds at trial, we review these claims only for plain error. See OCGA § 24-1-103 (d). See also *Kemp v. State*, 303 Ga. 385, 397-398 (810 SE2d 515)

9

(2018) (applying plain error standard of review to the appellant's unpreserved Confrontation Clause claim); *Lupoe v. State*, 300 Ga. 233, 243 (794 SE2d 67) (2016) (applying plain error review to the appellant's unpreserved hearsay claim).

(i) A Confrontation Clause violation occurs when an out-of-court statement admitted into evidence is "testimonial" in nature and the declarant is unavailable at trial and was not previously subject to cross-examination. See *Crawford v. Washington*, 541 U.S. 36, 68 (124 SCt 1354, 158 LE2d 117) (2004). As Appellant concedes, the admission of Smith's recorded statements did not violate the Confrontation Clause because she testified at trial and was subject to cross-examination. See id. at 59 n.9 ("[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of [her] prior testimonial statements.").

Appellant maintains, however, that the admission of Deberry's statements violated the Constitution. It is true that Deberry was unavailable at trial — he was dead — and he had not been subject

10

to cross-examination. But his statements were not testimonial.

> "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."

*Michigan v. Bryant*, 562 U.S. 344, 356 (131 SCt 1143, 179 LE2d 93) (2011) (citation omitted)). In determining whether the primary purpose of statements made in response to questions from law enforcement personnel is "to enable police assistance to meet an ongoing emergency," the reviewing court must "objectively evaluate the circumstances in which the encounter occur[red] and the statements and actions of the parties." Id. at 359. "[T]he relevant inquiry is . . . the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." Id. at 360.

It is clear from the body-camera recording and associated testimony that the police officers — who had responded to a 911 call

11

about a shooting to find a man with severe wounds lying in the street — were attempting to gather initial, basic information about the incident, including the identity of the shooter and whether he remained armed and dangerous somewhere nearby. See id. at 363 ("An assessment of whether an emergency that threatens the police and public is ongoing cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue."). Based on our review of the record,

> [t]he trial court properly concluded that [Deberry's] statements were nontestimonial in that they were not intended to establish or prove a past fact; rather, they were intended to describe current circumstances that required immediate police action, that is, securing a crime scene and determining whether an armed killer might still be in the vicinity.

*McCord v. State*, 305 Ga. 318, 323 (825 SE2d 122) (2019). See also *Johnson v. State*, 294 Ga. 86, 91 (750 SE2d 347) (2013). Accordingly, the admission of the now-disputed statements in the recording did not violate the Confrontation Clause.

(ii) Appellant's belated contention that Smith's and Deberry's

12

statements on the body-camera recording were inadmissible hearsay also fails, because the statements were admissible under the present-sense-impression or exited-utterance exceptions to the general rule against hearsay. See OCGA § 24-8-802 ("Hearsay shall not be admissible except as provided by this article . . . .").

Smith's statements repeating what Deberry mumbled (see footnote 2 above) qualified as present sense impressions. A present sense impression is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter[.]" OCGA § 24-8-803 (1). To be admitted under this exception, the statement must describe or explain an event or condition that is personally witnessed by the declarant and is "essentially contemporaneous" to the statement. *United States v. Green*, 556 F3d 151, 155 (3d Cir. 2009). See also *United States v. Scrima*, 819 F2d 996, 1000 (11th Cir. 1987); *Owens v. State*, 329 Ga. App. 455, 458 (765 SE2d 653) (2014).[4] Smith's

[4] Because OCGA § 24-8-803 (1) is materially identical to Federal Rule of Evidence 803 (1), we look for guidance to federal appellate case law

13

statements repeating Deberry's responses to the officer's questions satisfied these criteria. First, the statements described what she personally perceived: "He just said '.38,'" and "Yeah, he just said 'yeah.'" Second, the statements were made immediately, as Smith merely repeated Deberry's mumbled responses to make sure that the officers could hear them.

The rest of Smith's statements and all of Deberry's statements were admissible under the excited-utterance exception to the rule against hearsay. An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition[.]" OCGA § 24-8-803 (2).

> We have explained that "'the excited utterance need not be made contemporaneously [with] the startling event.'" Rather, the court should consider the totality of the circumstances in determining whether the statement was made while the declarant was "'still . . . under the stress or excitement that the startling event caused.'"

*Blackmon v. State*, 306 Ga. 90, 94 (829 SE2d 75) (2019) (citations

---

interpreting that provision. See *State v. Almanza*, 304 Ga. 553, 556-559 (820 SE2d 1) (2018).

14

and footnote omitted). Although the recording depicts Smith and Deberry after the shooting occurred, had an objection been raised, the trial court would have been fully authorized to rule that the stress and excitement caused by the shooting had not yet dissipated. The police officers responded just minutes after the shooting, and Deberry was still bleeding profusely as he waited for an ambulance. See, e.g., *Robbins v. State*, 300 Ga. 387, 389-390 (793 SE2d 62) (2016). As soon as the officers arrived, Smith frantically shouted, "I know who did it," and she appeared visibly shaken and panicky throughout the entire recording, even after Deberry was taken to the hospital. See, e.g., *Blackmon*, 306 Ga. at 95.

Because Appellant has not shown that any of the now-disputed statements on the body-camera recording were inadmissible hearsay, he has failed to show any error at all in this respect, much less plain error.

3. Appellant contends that his trial counsel provided constitutionally ineffective assistance in four ways. To succeed on his claims, Appellant must show that his counsel's performance was

15

professionally deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, Appellant must demonstrate that the lawyer performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. at 687-690; *Davis v. State*, 299 Ga. 180, 182-183 (787 SE2d 221) (2016). "In particular, 'decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.'" *Davis*, 299 Ga. at 183 (citation omitted). To establish prejudice, Appellant must demonstrate that there is a reasonable probability that, but for counsel's deficiency, the result of his trial would have been different. See *Strickland*, 466 U.S. at 694. We need not "address both components of the [ineffective assistance] inquiry if [Appellant] makes an insufficient showing on one." Id. at 697.

(a) Appellant first argues that his trial counsel was ineffective for failing to include Confrontation Clause and hearsay arguments

16

in the motion in limine to exclude the body-camera recording. For the reasons just discussed in Division 2 (b), however, those arguments would have been properly rejected, and counsel was not ineffective for failing to raise meritless arguments. See *Watson v. State*, 303 Ga. 758, 763 (814 SE2d 396) (2018) ("Failure to make a meritless objection cannot support a claim of ineffective assistance.").

(b) Appellant next argues that his trial counsel was ineffective for failing to specially demur to the counts in his indictment charging possession of a firearm by a convicted felon in violation of OCGA § 16-11-131 (b) and felony murder predicated on that crime, because neither count specified the felony of which he was previously convicted. But we have squarely held that

> it is irrelevant to a charge under OCGA § 16-11-131 (b) what felony formed the basis of the prior conviction, and specification of the underlying felony in the indictment is unnecessary. Accordingly, the decision by [Appellant's] trial counsel not to specially demur on this ground did not constitute deficient performance, nor would doing so have altered the outcome of the proceeding.

*Miller v. State*, 283 Ga. 412, 416 (658 SE2d 765) (2008). Thus, this

17

ineffective assistance claim is also meritless.[5]

(c) At trial, Appellant abandoned the defense he gave the police after he was arrested (that he was a bystander when someone else shot Deberry), and he offered two new defense theories: self-defense (that he had defended himself from an attack by Deberry) and accident (that the gun fired accidentally when he tried to take it away from Deberry). During closing argument, the prosecutor focused on Appellant's conflicting stories and told the jury that self-defense and accident were "mutually exclusive." Appellant now argues that his trial counsel was ineffective for failing to timely object to the prosecutor's arguments on this point. We disagree.

Although defendants typically assert either self-defense or accident, "[t]here is no hard and fast rule, in a homicide case, that

---

[5] Appellant's reliance on cases like *Ballard v. State*, 297 Ga. 248, 253 (773 SE2d 254) (2015), is misplaced. Those cases hold that proof of a previous felony conviction of the defendant is "'a necessary element of the state's proof' that [the defendant] was a convicted felon in possession of a firearm." Id. at 253 (quoting *Prather v. State*, 247 Ga. 789, 790 (279 SE2d 697) (1981)). It is therefore true that the State must allege and prove that the defendant was previously convicted of a felony, but it is also true that the particular prior felony need not be specified in the indictment, so the absence of such a specification does not give rise to a special demurrer. See *Miller*, 283 Ga. at 415.

[those two defenses] are always 'mutually exclusive'" as a matter of *law*, so a jury instruction on both defense theories may be available when both are requested and each is supported by at least slight evidence. *Turner v. State*, 262 Ga. 359, 360-361 (418 SE2d 52) (1992). This does not mean, however, that a prosecutor cannot aggressively point out in closing argument inconsistencies between those theories and the differing views of the evidence that would be required to support each of them. See id. at 362 (Bell, P. J., concurring specially) ("I have some concern that [permitting both self-defense and accident instructions] might encourage perjury, as, for instance, where a defendant testifies that the gun he was holding fired accidentally and killed the victim, but also testifies that he intentionally shot the victim in self-defense, but this concern is outweighed by the prosecutor's freedom to use such inconsistent testimony to try to impeach the defendant's credibility."). See also *Lamar v. State*, 297 Ga. 89, 93 (772 SE2d 636) (2015) ("A prosecutor is granted wide latitude in the conduct of closing argument, the bounds of which are in the trial court's discretion . . . ." (citation and

punctuation omitted)).

Moreover, Appellant's trial counsel testified at the motion for new trial hearing that he did not object to the prosecutor's comments for strategic reasons — because it was counsel's practice not to object during closing argument lest it appear that he was hiding something, and because he knew that the trial court would give the jury the proper instructions. Indeed, the court instructed the jurors before closing arguments began that the court would instruct them on the law. The court later correctly instructed the jury on the law of self-defense and accident, including this charge:

> If you find that the homicide . . . occurred by the discharge of a gun pointed at another by the Accused with the intent of placing the other in reasonable apprehension of immediately receiving a violent injury, even if the discharge of the gun was unintentional, such acts do not involve accident. If on the other hand, you find that the defendant was acting in self-defense and that the discharge of the gun was unintentional, you would be authorized to find accident.

Under these circumstances, trial counsel's decision not to object to the prosecutor's arguments was neither professionally deficient nor prejudicial. See *Jackson v. State*, 306 Ga. 266 (830

20

SE2d 99) (2019) (holding that trial counsel's strategic decision not to object to what he believed was a misstatement of law during the State's closing argument was not unreasonable); *Lamar*, 297 Ga. at 93 (holding that the appellant was not prejudiced by trial counsel's failure to object to the prosecutor's misstatement of law because arguments are not evidence and the trial court properly instructed the jury on the law of self-defense).

(d) Finally, Appellant argues that his trial counsel was ineffective for failing to move to exclude, move for a mistrial, or otherwise object to evidence regarding the shotgun that the police found in his house because the shotgun was not connected to any of the charged crimes. Pretermitting whether counsel should have objected to this evidence, there is no reasonable probability that it affected the outcome of Appellant's trial: the indictment charged Appellant with possession of a "handgun," not a shotgun; at trial, Appellant admitted his possession and use of the handgun (the .38-caliber revolver used to shoot and kill Deberry); the prosecutor elicited clear testimony from the lead detective that the shotgun was

21

not related to any of the charged crimes; and the evidence of Appellant's guilt, including testimony from two eyewitnesses and Appellant's own inconsistent stories, was strong. Accordingly, Appellant has not established ineffective assistance on this ground.

*Judgment affirmed. All the Justices concur.*

DECIDED SEPTEMBER 3, 2019.
Murder. Chatham Superior Court. Before Judge Abbot.
*Steven L. Sparger*, for appellant.
*Meg E. Heap, District Attorney, Jennifer L. Parker, Greg McConnell, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General,*

*Michael A. Oldham, Assistant Attorney General*, for appellee.